PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STATE OF NORTH CAROLINA ex rel.
ROY COOPER, Attorney General,
              *Plaintiff-Appellee,*

v.

TENNESSEE VALLEY AUTHORITY,
              *Defendant-Appellant.*

NEW YORK; MARYLAND; SOUTH
CAROLINA; CALIFORNIA; COLORADO;
CONNECTICUT; DELAWARE; ILLINOIS;
IOWA; MAINE; MASSACHUSETTS;
MISSISSIPPI; NEW HAMPSHIRE; NEW
JERSEY; OHIO; OKLAHOMA; RHODE
ISLAND; VERMONT; WISCONSIN;
WASHINGTON, D.C.; AMERICAN LUNG
ASSOCIATION; AMERICAN THORACIC
SOCIETY,
              *Amici Supporting Appellee.*

No. 06-2131

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(1:06-cv-00020)

Argued: October 31, 2007

Decided: January 31, 2008

Before WILLIAMS, Chief Judge, and NIEMEYER and
SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Shedd wrote the opinion, in which Chief Judge Williams joined. Judge Niemeyer wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Edwin W. Small, Assistant General Counsel, Office of the General Counsel, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellant. Christopher G. Browning, Jr., Solicitor General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Maureen H. Dunn, General Counsel, Harriet A. Cooper, Assistant General Counsel, Frank H. Lancaster, Senior Attorney, Maria V. Gillen, Attorney, Office of the General Counsel, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellant. Michael D. Goodstein, Stacey Myers, RESOLUTION LAW GROUP, P.C., Washington, D.C.; Richard E. Ayres, AYRES LAW GROUP, Washington, D.C.; Roy Cooper, Attorney General, James C. Gulick, Senior Deputy Attorney General, Marc Bernstein, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. Andrew Cuomo, Attorney General of the State of New York, Barbara D. Underwood, Solicitor General, Daniel Smirlock, Deputy Solicitor General, Michelle Aronowitz, Assistant Solicitor General, Robert Rosenthal, Assistant Attorney General, J. Jared Snyder, Assistant Attorney General, New York, New York; Douglas F. Gansler, Attorney General of the State of Maryland, Susan F. Martielli, Assistant Attorney General, Kathy M. Kinsey, Assistant Attorney General, Baltimore, Maryland; Henry McMaster, Attorney General of the State of South Carolina, Columbia, South Carolina; Edmund G. Brown, Jr., Attorney General of the State of California, Sacramento, California; John W. Suthers, Attorney General of the State of Colorado, Denver, Colorado; Richard Blumenthal, Attorney General of the State of Connecticut, Hartford, Connecticut; Joseph R. Biden, III, Attorney General of the State of Delaware, Wilmington, Delaware; Lisa Madigan, Attorney General of the State of Illinois, Chicago, Illinois; Thomas J. Miller, Attorney General of the State of Iowa, Des Moines, Iowa; G. Steven Rowe, Attorney General of the State of Maine, Augusta, Maine; Martha Coakley, Attorney General

of the State of Massachusetts, Boston, Massachusetts; Jim Hood, Attorney General of the State of Mississippi, Jackson, Mississippi; Kelly A. Ayotte, Attorney General of the State of New Hampshire, Concord, New Hampshire; Stuart Rabner, Attorney General of the State of New Jersey, Trenton, New Jersey; Marc Dann, Attorney General of the State of Ohio, Columbus, Ohio; W. A. Drew Edmondson, Attorney General of the State of Oklahoma, Oklahoma City, Oklahoma; Patrick C. Lynch, Attorney General of the State of Rhode Island, Providence, Rhode Island; William H. Sorrell, Attorney General of the State of Vermont, Montpelier, Vermont; J. B. Van Hollen, Attorney General of the State of Wisconsin, Madison, Wisconsin; Linda Singer, Acting Attorney General for the District of Columbia, Washington, D.C., for Amici States of New York, Maryland, South Carolina, California, Colorado, Connecticut, Delaware, Illinois, Iowa, Maine, Massachusetts, Mississippi, New Hampshire, New Jersey, Ohio, Oklahoma, Rhode Island, Vermont, Wisconsin, and Washington, D.C., Supporting Appellee. Hope M. Babcock, Senior Attorney/Director, Emma E. Garrison, Staff Attorney, Institute for Public Representation, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Amici American Lung Association and American Thoracic Society, Supporting Appellee.

## OPINION

SHEDD, Circuit Judge:

In 1933, Congress created the Tennessee Valley Authority ("the TVA") "in the interest of the national defense[,] for agricultural and industrial development, . . . to improve navigation in the Tennessee River[,] and to control the destructive flood waters in the Tennessee River and Mississippi River Basins." 16 U.S.C. § 831. As part of its mission, the TVA operates coal-fired power plants in Tennessee, Alabama, and Kentucky. The State of North Carolina brought this common-law nuisance action against the TVA, contending that these plants emit various pollutants which travel through the atmosphere into North Carolina, adversely impacting human health and environmental quality. North Carolina seeks an injunction prohibiting the TVA from operating its plants in a harmful manner and requiring it to abate the alleged nuisance.

The TVA moved to dismiss North Carolina's suit, arguing that it is barred by (1) the discretionary function doctrine, (2) the Supremacy Clause, and (3) the holding of *Ferris v. Wilbur*, 27 F.2d 262 (4th Cir. 1928). The district court rejected each of these arguments and denied the motion to dismiss. The district court then certified its decision for immediate appeal pursuant to 28 U.S.C. § 1292(b), and we accepted the appeal. The TVA now reasserts the same arguments it raised in the district court.[1] For the reasons set forth below, we affirm.

I

The TVA first argues that this suit is barred by the discretionary function doctrine. The discretionary function doctrine precludes a suit in tort against the United States, its agencies, or its officers where (1) "the challenged conduct involves an element of judgment or choice," and (2) "that judgment is of the kind that the discretionary function exception was designed to shield, *i.e.*, . . . the challenged action is based on considerations of public policy." *Suter v. United States*, 441 F.3d 306, 310-11 (4th Cir. 2006) (internal citations omitted). This exception from suit for discretionary acts generally arises in the context of the Federal Tort Claims Act ("FTCA"), where Congress provided that the United States' waiver of sovereign immunity does not extend to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The TVA, however, recognizes that it does not benefit from the discretionary function exception embodied in the FTCA because its sovereign immunity is not waived by the FTCA but by its own organic act. That is, Congress waived the sovereign immunity that the TVA would otherwise have possessed by specifically providing that the TVA may "sue and be sued in its corporate name." 16 U.S.C. § 831c(b). While both parties agree that this "sue-and-be-sued" clause waives the TVA's sovereign immunity to some degree, they dispute the scope of this waiver.

---

[1]Because this appeal raises only legal questions relating to subject-matter jurisdiction, we review de novo the decision of the district court. *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005).

Congress has waived the sovereign immunity of certain federal entities "by including in the enabling legislation provisions that they may sue and be sued." *Loeffler v. Frank*, 486 U.S. 549, 554 (1988). In contrast with other waivers of sovereign immunity, "sue-and-be-sued" waivers "should be liberally construed." *Id.* Thus, "when Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued,' it cannot be lightly assumed that restrictions on that authority are to be implied." *Id.* Instead, for an exception to the "sue-and-be-sued" authorization to exist, "it must be clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense." *FHA v. Burr*, 309 U.S. 242, 245 (1940) (footnote omitted); *see also Loeffler*, 486 U.S. at 554; *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 480 (1994). "Absent such a showing, agencies authorized to 'sue and be sued' are presumed to have *fully* waived immunity." *Meyer*, 510 U.S. at 481 (emphasis added). In other words, "it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." *Loeffler*, 486 U.S. at 554-55.

Under these principles, the TVA's "sue-and-be-sued" clause stands as a broad waiver of sovereign immunity which, absent a showing to the contrary, would encompass North Carolina's claims. The TVA, however, asserts that a discretionary function exception grounded in the constitutional concept of separation of powers renders this lawsuit inconsistent with the constitutional scheme. To support this position, the TVA looks to our holding in *McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (en banc).

In *McMellon*, we examined the question of whether a discretionary function exception bars a lawsuit filed against the United States under the Suits in Admiralty Act ("SIAA"). After noting that the SIAA does not contain a statutory exception from suit for discretionary functions, we concluded that such an exception nonetheless exists by virtue of

the constitutional doctrine of separation of powers. We based our conclusion on the fact that the Constitution does not allow judicial regulation which might "prevent[ ] the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 341. We likewise found that under our constitutional system "the Judicial Branch [may] neither be assigned nor allowed tasks that are more properly accomplished by other branches." *Id.* We therefore held that the courts may not assume the power to regulate, through the medium of tort liability, the manner in which the Executive Branch exercises the discretion which the Constitution assigns to it. *Id.* at 343.

We do not believe that the constitutional concerns underlying our decision in *McMellon* are present here. The TVA "is a corporate entity, separate and distinct from the Federal Government itself." *Pierce v. United States*, 314 U.S. 306, 310 (1941). Thus, the TVA maintains a separate corporate identity, a separate legal staff, and a separate headquarters. *TVA v. EPA*, 278 F.3d 1184, 1192-93 (11th Cir. 2002), *vacated in part on other grounds*, 336 F.3d 1236 (11th Cir. 2003). The Attorney General is prohibited from representing the TVA in a legal proceeding unless expressly requested by the TVA to do so. Pub. L. No. 98-181, § 1300 (1983), 97 Stat. 1292.[2] In addition, the TVA is removed from centralized control in Washington, enjoys discretionary ratemaking authority, and is exempt from at least 16 provisions of the Administrative Procedures Act. *TVA v. EPA*, 278 F.3d at 1192. More important than these structural symbols of independence, however, are the marks of independence which Congress has provided for the TVA. Congress has, for example, exempted the TVA from suit in the Court of Federal Claims, 28 U.S.C. § 1491(c); provided that the TVA shall be governed by an independent Board of Directors, 16 U.S.C. § 831a; exempted the TVA from the civil service laws, 16 U.S.C. § 831b; exempted the TVA from the purchasing requirements otherwise applicable to federal entities, 16 U.S.C. § 831h(b); and provided the TVA with authority to issue bonds which are not obligations of the United States, 16 U.S.C. § 831n-4(b). More-

---

[2]The TVA has, in fact, sued the United States on several occasions, successfully arguing that its separation from the Executive Branch enables it to sue both the United States and its executive agencies. *See, e.g., TVA v. EPA*, 278 F.3d at 1192; *TVA v. United States*, 51 Fed. Cl. 284 (2001).

over, the TVA funds its power-generating programs itself rather than with congressional appropriations. 16 U.S.C. § 831n-4.

Congress' statements with regard to the TVA lend support to its independence. When creating the TVA in 1933, Congress indicated that it "intend[s] that the corporation shall have much of the essential freedom and elasticity of a private business corporation." H.R. Rep. No. 73-130 at 19 (1933). Even more telling, Congress exempted the TVA from the FTCA, *see* 28 U.S.C. § 2680(l), because it intended that legal claims "be exercised against the Tennessee Valley Authority exactly as they could have been exercised against . . . private utility companies." 79 Cong. Rec. 6563-64 (1946) (statement of Sen. Hill).

This degree of independence which the TVA possesses in large part alleviates the constitutional concerns which we recognized in *McMellon*. A lawsuit against the TVA is not a suit against the United States itself or one of its agencies subject to the direct executive control which is granted to the President by Article II of the Constitution. Rather, a suit against the TVA is against "a governmental agency in[ ] the commercial world," *Loeffler*, 486 U.S. at 555, that is governed by an independent Board of Directors, 16 U.S.C. § 831a(g).[3] Because the TVA is so far removed from the control of the Executive Branch, operating as the functional equivalent of a private corporation, the judiciary does not run the same risk of overstepping its bounds and "prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions," *McMellon*, 387 F.3d at 341, that it did in *McMellon*.

Even were the TVA more tightly linked with the Executive Branch, this case would not conflict with the principles recognized in *McMel-*

---

[3]Although the President appoints the TVA's Board of Directors (with the advice and consent of the Senate), as with many independent government agencies and corporations, the President's power of appointment, standing alone, does not subject the agency to direct presidential control. *See Morrison v. Olson*, 487 U.S. 654, 688-691 (1988) (noting certain independent government agencies which are located within the Executive Branch and headed by presidential appointees but which are free from presidential control).

*lon*. In this case, a judicial decision on the lawfulness of the TVA's plant emissions does not strip the TVA of its authority to execute its statutory duties. At most, it could require the TVA to take into account and to abide by certain air quality standards when operating its coal-fired power plants. As the district court recognized, "[t]he Executive's ability to decide the level of pollutants to emit within the allowed bounds, how best to address any necessary reduction in pollutants, how to allocate [the] TVA's funds and other resources . . . and a myriad of other issues and decisions would remain untouched." *North Carolina v. TVA*, 439 F. Supp. 2d 486, 494 (W.D.N.C. 2006). Similarly, permitting this suit to go forward does not require the Judicial Branch to perform Executive Branch functions or decide issues it is not equipped to resolve. *See McMellon*, 387 F.3d at 342 ("[I]f all executive-branch actions taking place in the maritime arena were subject to judicial review, the judiciary would be called upon to decide issues it is not equipped to resolve."). The federal courts have long resolved nuisance claims, including public nuisance claims, through state-law equity actions, and they have used this power to regulate pollution and other noxious emissions. *See, e.g., Scribner v. Summers*, 84 F.3d 554 (2d Cir. 1996); *Wright v. Masonite Corp.*, 368 F.2d 661 (4th Cir. 1966). This case, then, involves the "overlapping responsibility" between the three branches of government which the Constitution permits, *Mistretta v. United States*, 488 U.S. 361, 381 (1989), rather than intrusion by one branch into another's functions.

Accordingly, we conclude that this suit does not implicate the separation-of-powers concerns which led to our decision in *McMellon*. We therefore hold that the broad waiver of sovereign immunity effected by the TVA's "sue-and-be-sued" clause is not restricted by a discretionary function exception in this case.[4]

---

[4]Some courts have found that the TVA benefits from a discretionary function exception when it engages in governmental functions. *See, e.g., Queen v. TVA*, 689 F.2d 80, 85 (6th Cir. 1982) ("[I]n certain limited situations the TVA is exempt from liability arising out of the exercise of certain wholly governmental functions, where the TVA acts solely as the Government's agent and where the United States itself would not be liable."). Whether the TVA retains a measure of sovereign immunity when it engages in a governmental function is not a question we need reach. In this case, it is clear, for the reasons outlined above, that the TVA's

## II

We next turn to the TVA's contention that the Supremacy Clause bars this lawsuit from proceeding. By virtue of the Supremacy Clause, the "activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). However, Congress may waive the protections of the Supremacy Clause and authorize state regulation of federal entities where the waiver is "clear and unambiguous." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988). At issue here is the waiver of Supremacy Clause immunity which Congress included in the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq*.

The CAA provides that federal facilities such as the TVA:

[S]hall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of air pollution in the same manner, and to the same extent as any nongovernmental entity. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement whatsoever) . . . (C) to the exercise of any Federal, State, or local administrative authority, and (D) to any process and sanction, whether enforced in Federal, State, or local courts, or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law.

---

power-generating activities are commercial in nature and thus are not immune to suit. We note that we are not the first court to reach this conclusion. *See, e.g., Latch v. TVA*, 312 F. Supp. 1069, 1072 (N.D. Miss. 1970) (finding TVA has no sovereign immunity to claim arising from "acts relating to the distribution and sale of electric power"); *see also Smith v. TVA*, 436 F. Supp. 151, 153-54 (E.D. Tenn. 1977); *Brewer v. Sheco Const. Co.*, 327 F. Supp. 1017, 1019 (W.D. Ky. 1971); *Adams v. TVA*, 254 F. Supp. 78, 80 (E.D. Tenn. 1965); *Grant v. TVA*, 49 F. Supp. 564 (E.D. Tenn. 1942).

42 U.S.C. § 7418(a). The TVA argues that this provision of the CAA waives only some of the protections of the Supremacy Clause in that it subjects the TVA only to state "requirements" which are based on objective, quantifiable standards subject to uniform application. The TVA therefore contends that a state-law nuisance action, not embodying an objective, quantifiable standard, does not fall within Congress' waiver of Supremacy Clause protection. In essence, the TVA maintains that a common-law nuisance action is not a "requirement" within the meaning of the CAA.

In assessing the TVA's argument, we look first to "the literal and plain language of the statute." *Markovski v. Gonzales*, 486 F.3d 108, 110 (4th Cir. 2007). Because the CAA does not define "requirement," we must accord the term its "ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import." *DIRECTV, Inc. v. Nicholas*, 403 F.3d 223, 225 (4th Cir. 2005). In common parlance, "requirement" means "[s]omething that is required; something obligatory." American Heritage Dictionary 1050 (2d coll. ed. 1991). "Require," in turn, means "[t]o impose an obligation on; compel." *Id.* Nothing in the definition of "requirement" restricts the term's meaning to objective, quantifiable standards which must be met. Nor does anything in the CAA indicate that Congress intended that the term bear the narrow meaning the TVA suggests. The plain language of the CAA, then, does not support the TVA's position.

The TVA's reading of "requirements" likewise finds no support in case law, for the Supreme Court has held that state "requirements" include common-law standards. In *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), the Court considered the reach of a preemption statute which provided that

> No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Chapter.

15 U.S.C. § 1334(b). The question before the Court was whether this statute encompassed state common-law claims. In answering this question, the Court held:

> The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules. [State] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.

*Cipollone*, 505 U.S. at 521 (plurality opinion) (internal citations and quotations omitted).[5] The Court therefore rejected the notion that a common-law tort action is not a "requirement" of state law while noting that a contrary interpretation would be "at odds both with the plain words" of the statute and "with the general understanding of common-law damages actions." *Id.*

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), is similar. There, the Court relied on *Cipollone* when determining the meaning of another preemption statute which provided that "no State . . . may establish or continue in effect . . . any requirement" which differs from the federal requirement. *Id.* at 503 (citing 21 U.S.C. § 360k(a)). A majority of the Court held that a state common-law tort action may impose a "requirement" within the meaning of § 360k(a).[6] Justice Breyer noted that "[o]ne can reasonably read the word 'requirement' as including the legal requirements that grow out of the application, in particular circumstances, of a State's tort law." *Id.* at 504. Similarly, Justice O'Connor wrote that "[S]tate common-law damages actions operate to require manufacturers to comply with common-law duties." *Id.* at 510.

---

[5]The fact that North Carolina seeks to hold the TVA liable in tort by seeking injunctive relief rather than damages does not lessen *Cipollone's* relevance here. *Cipollone* itself noted that a state requirement can be manifested in damages and "preventive relief."

[6]The *Medtronic* decision was the product of a fractured Court. Nonetheless, a majority consisting of Chief Justice Rehnquist and Justices O'Connor, Scalia, Thomas, and Breyer found that the statute's reference to "requirement" included state common-law actions. *See Duvall v. Bristol-Meyers-Squibb Co.*, 103 F.3d 324, 329 (4th Cir. 1996) (noting majority of fractured *Medtronic* Court agreed on this point).

In this case, the phrases "all requirements" and "any requirement" sweep at least as broadly as the "no requirement" and "any requirement" language at issue in *Cipollone* and *Medtronic*.[7] The *Cipollone* and *Medtronic* Courts' expansive construction of "requirement" and their unequivocal holdings do not support the TVA's preferred narrow reading of the term, and we see no basis for adopting a more limited definition here.[8]

In sum, the plain meaning of "requirement" and the Supreme Court's broad interpretation of the term foreclose the TVA's argument that the CAA does not mandate compliance with state "requirements" enforced through a common-law tort suit. This being the case, we conclude that this lawsuit falls within Congress' waiver of the TVA's Supremacy Clause protections.

III

Finally, we turn to the TVA's contention that our decision in *Ferris*

---

[7]We note that Congress used the term "all" in the CAA to express its intent that the CAA's waiver provisions be interpreted broadly. After the Supreme Court interpreted the CAA's reference to "requirement" to include substantive but not procedural requirements, *see Hancock v. Train*, 426 U.S. 167 (1976), Congress immediately responded by amending the CAA to refer to "*all* requirements" in order "to express, with sufficient clarity, the . . . desire to subject Federal facilities to all Federal, State, and local requirements — procedural, substantive, or otherwise — process, and sanctions," H.R. Rep. No. 95-294 at 199 (1977). Congress clearly had both *Hancock* and the Supremacy Clause in mind when enacting this amendment. *See id.* at 198-99 (amendments "intended to overturn the *Hancock* case" and to overcome "[c]onstitutional arguments regarding the supremacy clause").

[8]In both *Cipollone* and *Medtronic*, the Court operated under a presumption that favored a narrow reading of the term "requirement." *See Medtronic*, 518 U.S. at 485 (presuming "that Congress does not cavalierly pre-empt state-law causes of action"); *Cipollone*, 505 U.S. at 522 (noting presumption against preemption). Despite this presumption, the Court interpreted "requirement" broadly to include state-law tort claims. The absence of a narrowing presumption in this case seems to us to indicate that "requirement" retains at least the breadth of meaning ascribed to it in *Cipollone* and *Medtronic*.

*v. Wilbur*, 27 F.2d 262 (4th Cir. 1928), bars North Carolina's cause of action. In *Ferris*, a private citizen sued the Secretary of the Navy in nuisance, seeking an injunction against the storage of weapons at a naval facility. We held that the suit must be dismissed because the "use of government property [had been] authorized by Congress and [lay] within the discretion of the executive." *Id.* at 264. We noted that a contrary holding would permit "the judicial department to interfere with the reasonable discretion of the executive." *Id.*

This cited language amply demonstrates that *Ferris* was an early case applying the discretionary function doctrine. Further, because there was no statutory discretionary function exception at issue in *Ferris*, our ruling necessarily rested on the constitutional concept of separation of powers. *See id.* (permitting suit to go forward "would be contrary to our theory of government"). As we have already concluded, this concept does not preclude North Carolina's suit against the TVA. *Ferris* does nothing to change this conclusion. *Ferris* was a suit against the Secretary of the Navy, an executive official under the direct authority of the President. As a result, *Ferris* raised many of the same concerns we recognized in *McMellon* but which are not present in this case against the TVA, an independent governmental entity. We therefore find *Ferris* to be inapposite and hold that it presents no bar to North Carolina's lawsuit.

## IV

Based on the foregoing, we conclude that none of the arguments raised by the TVA prevents this suit from proceeding. Accordingly, we affirm the denial of the TVA's motion to dismiss.

*AFFIRMED*

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

In this case, the State of North Carolina sues the Tennessee Valley Authority ("TVA") under the North Carolina common law of nuisance to enjoin the way that the TVA operates its coal-fired power plants in other States, namely Tennessee, Alabama, and Kentucky. North Carolina alleges that the lawful emissions from the TVA's

power plants in other States travel downwind and reach North Carolina airspace, where they damage human health and the environment in North Carolina. Even though such emissions are regulated by and in compliance with the federal Clean Air Act and State law at the location of the plants, North Carolina contends that the emissions, whether permitted under applicable statutory laws, nonetheless create a public nuisance under North Carolina common law.

The threshold question presented to us is whether the TVA, a federal agency, is immune from such a suit. Arguing that it is not, North Carolina points to waivers of immunity contained in the TVA Act, 16 U.S.C. § 831c, which provides that the TVA "may sue and be sued in its corporate name," and in the Clean Air Act, 42 U.S.C. § 7418(a), which provides that every agency of the federal government is subject to and must comply with "*all* Federal, *State*, interstate, and local *requirements*, administrative authority, and process and sanctions *respecting the control and abatement of air pollution* in the same manner, and to the same extent as any nongovernmental entity." (Emphasis added). The majority concludes that North Carolina may proceed under either waiver, as either is sufficiently broad to authorize North Carolina's suit against the TVA. While I agree that the language of both statutes is sufficiently broad to authorize the district court to consider the North Carolina suit on its merits, I conclude that 16 U.S.C. § 831c must be read in light of the Constitution's separation of powers doctrine, which precludes a suit challenging a governmental agency's exercise of its discretionary functions. *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984); *McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004 (en banc), *cert. denied*, 544 U.S. 974 (2005).

The TVA was created in 1933, during the Depression, as a federal agency to implement major national programs and policies. And as the agency created to carry out the important work of the federal government that transcends any individual State's interests, it is constitutionally protected from State suits initiated by a State disagreeing with congressional programs and policies. In connection with the particular issues raised in this case, the TVA was authorized by Congress to employ available technology for the generation of power, including the very coal-fired generators that North Carolina complains about in this action. For decades, these generators have provided energy to a

broad, multistate area of the country and, to be sure, have produced emissions that tend to pollute. But the emissions were a tradeoff inherent in the project created by Congress, and Congress made the governmental choice of providing the benefits given by the TVA at the expense of some clean air, even if clean air was an important policy of any given State. *See Dalehite v. United States*, 346 U.S. 15 (1953), *affirming*, *In re Texas City Disaster Litigation*, 197 F.2d 771 (5th Cir. 1952) (en banc) (finding the TVA immune from suit over an explosion of ammonium nitrate fertilizer being shipped during World War II, based on the fact that the tortious conduct involved decisions balancing safety risks against cost and production schedule benefits of expediting manufacturing and shipping to accomplish foreign aid goals). If the old technology impliedly authorized by Congress from the beginning of the TVA can be updated or replaced to provide less pollution, the decision would have to be a federal decision based on a number of discretionary factors balancing the environmental risks with the economic viability of the program. But it cannot be for any one State to dictate to Congress or an agency that Congress creates how it must carry out its discretionary functions. Discretionary governmental decisions are protected from State intervention by the Constitution through the doctrine of separation of powers and the Supremacy Clause.

Against this incontrovertible background, I cannot conclude that in authorizing the TVA "to sue and be sued," Congress intended to traverse separation of powers principles and authorize a State suit against the federal agency questioning the fundamental decisions of the federal government to create the TVA and build coal plants to provide energy and thereby inherently authorize some emissions that are within federal and state regulatory standards. Such a conclusion tends to stand the federal structure on its head, permitting States to disagree with federal policies and dismember projects undertaken by the federal government in accordance with federal authority. Allowing such a suit without an explicit waiver of sovereign immunity with respect to discretionary functions is no different than subjecting the federal government to suits in other analogous contexts — which we have recognized is prohibited — such as suits challenging the decision to build a dam across a navigable waterway, or claiming damage caused by the government's decision to change the course of the Missouri River, or claiming damages caused by the federal government in its

search for illegal drugs. *See McMellon v. United States*, 387 F.3d 329, 342 (4th Cir. 2004) (en banc), *cert. denied*, 544 U.S. 974 (2005). In *McMellon* we held that "the discretionary function exception embodies separation-of-powers principles that are important enough to require courts to apply a discretionary function exception to statutes that are silent on the issue." *Id.* at 344; *see also Tiffany v. United States*, 931 F.2d 271, 276-77 (4th Cir. 1991) (same); *Duke Power Co. v. Greenwood County*, 91 F.2d 665, 674 (4th Cir. 1937), *aff'd*, 302 U.S. 485 (1938); *Ferris v. Wilbur*, 27 F.2d 262 (4th Cir. 1928).

For these reasons, I conclude that our decisions in *McMellon* and the other similar cases apply, precluding our finding that a federal statute authorizing the TVA to be sued but remaining silent on whether it could be sued for discretionary functions should amount to a waiver of immunity for making discretionary decisions.

The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, however, presents a different question inasmuch as it is a competing federal governmental policy that directly implicates the emissions from TVA's coal-fired plants. In that Act, Congress did subject the TVA and other federal agencies to suits in the limited circumstance where the federal agency fails to meet federal or State "requirements . . . respecting the control and abatement of air pollution." *See* 42 U.S.C. § 7418(a). I agree with the majority that "requirements" cannot be cabined to mean objective, quantifiable State standards, as urged by the TVA. But the waiver is nonetheless limited to violations of State requirements "respecting *the control and abatement* of air pollution." *Id.* (Emphasis added). We do not decide now whether North Carolina common law creates such a requirement, and I agree that we should remand this case to the district court to determine, under North Carolina common law, whether that law has defined a tort imposing a "requirement respecting the control and abatement of air pollution." If the common law does, then the suit for violation of that law is authorized by the waiver contained in § 7418(a) of the Clean Air Act, even if the emissions are the product of a discretionary function.

Accordingly, I concur in the judgment but dissent from the rationale supporting that judgment to the extent it is inconsistent with what I have stated in this separate opinion.