**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1379**

RODNEY W. HARRELL, Individually and on behalf of all others similarly situated,

Plaintiff – Appellant,

v.

FREEDOM MORTGAGE CORPORATION, A New Jersey Corporation,

Defendant – Appellee.

------------------------------

CONSUMER FINANCIAL PROTECTION BUREAU,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony J. Trenga, District Judge. (1:18-cv-00275-AJT-TCB)

Argued:  May 18, 2020                                    Decided:  October 2, 2020

Before THACKER and RICHARDSON, Circuit Judges, and Kenneth D. BELL, United States District Judge for the Western District of North Carolina, sitting by designation.

Reversed by published opinion.  Judge Richardson wrote the opinion, in which Judge Thacker and Judge Bell joined.

**ARGUED:** Rodney W. Harrell, BEINS, AXELROD, P.C., Washington, D.C., for Appellant. Kevin E. Freidl, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C., for Amicus Curiae. Kim M. Watterson, REED SMITH, LLP, Los Angeles, California, for Appellee. **ON BRIEF:** Justin P. Keating, BEINS, AXELROD, P.C., Washington, D.C., for Appellant. Justin deBettencourt, McLean, Virginia, Travis A. Sabalewski, REED SMITH LLP, Richmond, Virginia, for Appellee. Mary McLeod, General Counsel, John R. Coleman, Deputy General Counsel, Steven Y. Bressler, Assistant General Counsel, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C., for Amicus Curiae.

RICHARDSON, Circuit Judge:

In this appeal, we are asked to interpret the word "servicer" in the Real Estate Settlement Procedures Act of 1974 ("RESPA"), Pub. L. 93-533, 88 Stat. 1724 (codified at 12 U.S.C. § 2601 *et seq.*). If a mortgage contract requires the borrower to place property-tax payments in escrow, then RESPA requires "the servicer" to make those tax payments on time. 12 U.S.C. § 2605(g).

Ordinarily, there is little question about the identity of the mortgage servicer. But the right to service a mortgage—like the mortgage itself—is an asset that may be subject to purchase and sale. An interpretive difficulty supposedly arises when servicing rights are transferred in the window between the borrower's payment to escrow and the tax's due date. In that scenario, who is "the servicer" that federal law holds accountable for making the tax payment? According to the plaintiff, RESPA requires taxes to be paid by the entity responsible for servicing the mortgage *at the time the tax payment is due*. But, in the defendant's view, RESPA demands that the entity that *received funds for escrow* make the tax payment when it is ultimately due. The district court agreed with the defendant.

In our view, the text and structure of RESPA show that the plaintiff is correct. By requiring "the servicer" to make tax payments "as [they] *become due*," RESPA connects the servicer's obligation to a payment's due date, not the date of payment into escrow by the borrower. § 2605(g) (emphasis added). So the relevant "servicer" is the entity "responsible for servicing" the mortgage when the tax payment is due. § 2605(i)(2). Here, the plaintiff has sufficiently alleged that the defendant bore the responsibility for servicing

3

his mortgage on the tax's due date. So under RESPA, the defendant would be "the servicer" accountable for effecting that tax payment on time. Accordingly, we reverse.

## I. Background

### A. The Real Estate Settlement Procedures Act

When Congress passed RESPA in 1974, it enacted "significant reforms" that purported to provide "consumers throughout the Nation . . . with greater and more timely information on the nature and costs of the [real estate] settlement process." § 2601(a). To see that RESPA's rules would be followed, Congress gave its new law teeth. RESPA sanctions certain private rights of action, and it empowers federal and state regulators to enforce its dictates. *See, e.g.*, §§ 2605(f), 2607(d), 2608(b). Congress has since authorized the Consumer Financial Protection Bureau ("CFPB") to administer RESPA by "prescrib[ing] [] rules and regulations . . . necessary to achieve [RESPA's] purposes." § 2617(a).

One of RESPA's reforms targeted "the amounts home buyers are required to place into escrow accounts established to insure the payment of real estate taxes." § 2601(b)(3). In general, an "[e]scrow account" is an "account that a servicer establishes or controls on behalf of a borrower to pay taxes" and other charges. 12 C.F.R. § 1024.17(b); *accord Escrow*, 5 Oxford English Dictionary 391 (2d ed. 1989) ("A deposit held in trust or as a security."). RESPA permits lenders to require borrowers to send the tax payments to a mortgage servicer for escrow (instead of the borrower paying taxes directly to the government). *See* 12 U.S.C. § 2605(g); 12 C.F.R. § 1024.17. The practice of paying taxes through servicers assures lenders that tax payments are made, thus protecting against tax

4

liens and other risks to a lender in the event of foreclosure. *See* Ronald H. Jarashow, Comment, *The Improper Use of Tax and Insurance Escrow Payments by Mortgagees*, 25 CATH. U. L. REV. 102, 102–04 (1975).

If a federally related mortgage contract imposes this requirement on a borrower, then federal law imposes certain reciprocal requirements on the mortgage servicer. Central to this appeal, 12 U.S.C. § 2605(g) requires "the servicer" to apply escrowed funds to a tax bill on time: "[T]hat is, on or before the deadline to avoid a penalty." 12 C.F.R. § 1024.17(k)(1). But in 2017, one of plaintiff Rodney Harrell's tax payments was not made on time. And that missed payment would spiral into the putative class action driving this appeal.

## B.    Factual background

In April 2005, Harrell bought a single-family residential property in Alexandria, Virginia, with a mortgage from the NYCB Mortgage Company ("NYCB"). At that time, the average rate on a 30-year fixed-rate mortgage in the United States was around 5.8%. *See* Freddie Mac, *30-Year Fixed Rate Mortgage Average in the United States (MORTGAGE30US)*, FRED, FEDERAL RESERVE BANK OF ST. LOUIS (2020). But by September 2012, that rate dropped to nearly 3.5%. *See id.*; J.A. 15. So Harrell refinanced, taking out a new mortgage from NYCB to replace his existing obligation.

Two features of Harrell's new mortgage contract are of note. First, Harrell's mortgage required him to make his property-tax payments to NYCB for deposit into an escrow account. As described above, this requirement triggered a corresponding obligation

5

for NYCB, Harrell's servicer as well as his lender, to pay his property-tax bill on time.[1] *See* 12 U.S.C. § 2605(g); 12 C.F.R. § 1024.17(k)(1).

Second, the mortgage permitted NYCB to sell Harrell's mortgage and transfer the rights to service his mortgage. And, in June 2017 (five years after Harrell refinanced), NYCB did just that: It sold Harrell's mortgage—as part of a much larger transaction—to the defendant, Freedom Mortgage Corporation ("Freedom").[2] Freedom thus took over all servicing rights and responsibilities from NYCB, effective October 31, 2017. And, starting November 1, 2017, Harrell became obligated to pay his mortgage payments to Freedom.

NYCB made Harrell's June 2017 tax payment to Alexandria without incident. It paid Alexandria the money Harrell had deposited into escrow by the June 15, 2017 due date.

But the November 2017 payment, $4,102.14, was late. Before October 31, 2017, Harrell had deposited the funds in the escrow account, then overseen by NYCB. Ownership of Harrell's mortgage—and the rights to service it—transferred from NYCB to Freedom on October 31, 2017. November 15, 2017 came and went; Harrell's funds remained in escrow. In 2018, Freedom eventually made Harrell's tax payment from the escrow account. But Alexandria assessed late payment penalties (which Freedom

---

[1] Alexandria requires that homeowners make two tax payments each calendar year—one on June 15 and another on November 15.

[2] The overall deal involved the purchase of around $500 million in residential mortgage assets as well as transfer of the right to service over $20 billion of residential mortgage loans. *See* J.A. 56.

ultimately paid), and the tardy payment adversely affected Harrell's 2017 income-tax bill in the amount of $895.[3]

Harrell then filed this putative class action against Freedom. In his complaint, Harrell alleges that Freedom's failure to make a timely tax payment violated RESPA (Count 1), breached his mortgage contract (Count 2), and was negligent (Count 3). Freedom disclaimed any responsibility, arguing that it was not the "servicer" responsible for the November 15 tax payment—that was NYCB. The district court agreed with Freedom: NYCB was responsible as "the servicer" under RESPA. And so the court granted Freedom's motion to dismiss for failure to state a claim. *See Harrell v. Freedom Mortg. Corp.*, No. 118-cv-275-AJT-TCB, 2018 WL 4178317 (E.D. Va. July 18, 2018).[4]

Harrell timely appealed, and he now presses only the RESPA claim (Count 1). We have jurisdiction. *See* 28 U.S.C. § 1291.

---

[3] Harrell alleges that this injury arises in part from changes to the 2018 tax code. If Freedom had paid his tax bill in 2017, Harrell explains that he would have deducted the bill from his 2017 taxable income and saved $895. But the "Tax Cuts and Jobs Act" capped deductions for state and local taxes at $10,000. *See* Pub. L. No. 115-97, §§ 11042(a), 131 Stat. 2054, 2086 (2017) (codified at 26 U.S.C.A. § 164(b)(6)(B)). And Harrell claimed that because his state and local taxes would exceed that amount in 2018, Freedom's late payment prevents him from ever realizing these tax savings.

[4] Harrell then sought reconsideration under Federal Rules of Civil Procedure 54 and 59(e). The district court declined to revisit its ruling. *Harrell v. Freedom Mortg. Corp.*, No. 118-CV-275-AJT-TCB, 2019 WL 9047223 (E.D. Va. Mar. 12, 2019). Harrell also appeals this denial. Because we find that the district court's underlying decision requires reversal, we need not decide the reconsideration issue.

## II.     Discussion

The case has been winnowed on appeal to a single question of statutory interpretation. Under RESPA, who was the "servicer" responsible for Harrell's November tax payment? We review the district court's answer de novo. *See Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).[5] RESPA requires that the entity responsible for servicing a mortgage when a tax payment is due must make that payment. Since Harrell has plausibly alleged that Freedom was responsible for servicing his mortgage at that time, his complaint stands, and this suit may proceed.

### A.     The plain meaning of RESPA

When interpreting a statute, we start with its text. *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). And we give that text its "ordinary, contemporary, common meaning" and must "enforce it according to its terms." *Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011) (quoting *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 357

---

[5] At the motion-to-dismiss stage, we "accept[] all well-pleaded allegations in the plaintiff's complaint as true and draw[] all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). The plaintiff's case may proceed so long as these "facts state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Although "extrinsic evidence should not be considered at the 12(b)(6) stage," this rule is not without exception. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). A court may consider a document attached to a motion to dismiss if that document "was integral to and explicitly relied on in the complaint" and if its authenticity is not challenged. *Id.* (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). Thus, we do not think it was error for the district court to have considered the NYCB-Freedom asset purchase agreement without converting the defendant's submission to a motion for summary judgment. *See Harrell*, 2018 WL 4178317, at *2 n.2. Similarly, we think it permissible to consider the terms of Harrell's loan.

(4th Cir. 2008); *Lamie*, 540 U.S. at 534). We do not ask how NYCB and Freedom agreed by contract to allocate servicing responsibilities between themselves—our inquiry is on what the statute requires.

Here, our analysis centers on three subsections of 12 U.S.C. § 2605. First, § 2605(g) establishes the obligation for a servicer to make payments from the escrow account for taxes. Second, § 2605(i)(2) defines the term "servicer." And last, § 2605(i)(3) supplements § 2605(i)(2) by defining "servicing." For the sake of clarity, we refer to these provisions respectively as "subsection (g)," "subsection (i)(2)," and "subsection (i)(3)." We consider each provision in turn.

Subsection (g) creates the obligation for "the servicer" to make payments from an escrow account:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.

To begin, we note the two factors that trigger a servicer's obligation to make payments under subsection (g). First, this subsection governs only "federally related mortgage loan[s]." And here, Harrell's loan so qualifies.[6] Second, a servicer's obligation to make

---

[6] *See* J.A. 7; Appellant Br. 10–11. *See generally* 12 U.S.C. § 2602(1) (defining "federally related mortgage loan"); Arielle L. Katzman, *A Round Peg for a Square Hole: The Mismatch Between Subprime Borrowers and Federal Mortgage Remedies*, 31 CARDOZO L. REV. 497, 507 n.64 (2009) (asserting that the term "encompasses virtually every residential real estate transaction closing in the United States").

payments is triggered only when the "terms" of the loan "require the borrower to make [tax] payments . . . into an escrow account." Again, the terms of Harrell's loan so require. *See* J.A. 2, 53–54. Accordingly, Harrell's servicer "shall make [tax] payments from the escrow account" as they "become due." The servicer must follow this statutory mandate, *see Holland v. Pardee Coal Co.*, 269 F.3d 424, 431 (4th Cir. 2001) ("shall" is mandatory), or Harrell, as the borrower, may seek actual damages, statutory damages, costs, and attorneys' fees. *See* § 2605(f).

Consider the way subsection (g) employs the word "servicer." On its face, subsection (g) connects "the servicer's" responsibility to effect a payment to the date that payment "becomes due"—that is, the date at which payment is required, *see Due*, 4 Oxford English Dictionary 1105 (2d ed. 1989) (the "day on which any payment . . . become[s] immediately payable").[7] The obligation for the servicer to make payment is triggered by the "terms of . . . [the] loan" and the date at which a payment "becomes due," not the date that a payment is received for escrow. § 2605(g); *see Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987) ("Congress could have phrased its requirement in language that looked to the past . . . , but it did not choose this readily available option."). Indeed, subsection (g) does not mention when (or whether) a payment is received into escrow from a borrower.[8] The natural reading of this subsection thus

---

[7] The CFPB has further specified that "timely manner" means "on or before the deadline to avoid a penalty." 12 C.F.R. § 1024.17(k)(1).

[8] Thus, as the CFPB explains, RESPA and its implementing regulations do not require tracing between borrower payments into escrow and the obligation for servicers to (Continued)

contemplates that whoever "the servicer" is when a payment becomes due shall make that payment. Because Harrell's payment was due November 15, 2017, our task is to identify—based on the allegations in his complaint—who RESPA considers "the servicer" on that date.

To answer that question, we turn to RESPA's definition of "servicer." *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition."). Subsection (i)(2) defines "servicer" as "the person responsible for servicing of a loan."[9] Thus, combined with subsection (g), it follows that the person "*responsible* for servicing" the mortgage at the time a payment is due must make that payment. The term "servicing" itself is further defined in subsection (i)(3) as:

> [R]eceiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . , and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

Turning back to Harrell's complaint given these provisions, we conclude that Harrell plausibly alleged that Freedom was responsible for servicing his mortgage on November 15, 2017. Harrell alleges that "NYCB transferred [his] mortgage . . . , including the servicing of [his] loan, to Freedom" before November 15, 2017. J.A. 3. With this transfer, Harrell says, Freedom became "responsible both for receiving [his] payments

_____

make payments out. Amicus Br., CFPB, at 18. In fact, servicers may have to make timely payments for taxes even when an escrow balance is deficient. *See* 12 C.F.R. § 1024.17(k).

[9] Note that throughout RESPA, the term "person" includes both natural persons and artificial entities. 12 U.S.C. § 2602(5).

11

designated for subsequent tax payments and for actually making those tax payments." J.A. 7. Indeed, the NYCB-Freedom Purchase Agreement shows that, as of November 1, 2017, Freedom acquired "all right, title and interest of [NYCB] . . . as Servicer under the Servicing Agreements" and "the related Servicing obligations as specified in each Servicing Agreement." J.A. 94, 97. Accordingly, Freedom agreed to "assume, pay, perform and discharge the obligation to service the Serviced Loans [] on and after" that date. J.A. 100. Thus, the complaint properly alleges that Freedom was "responsible for servicing the loan" on November 15, 2017, and as the supposed servicer on that date, obligated to make the tax payment.

The broader statutory structure reinforces this allocation of responsibility. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018) (looking to statutory structure). Not limited to escrow accounts, § 2605 broadly governs the "assignment, sale, or transfer of loan servicing." § 2605(a). And it imposes certain requirements in servicing transactions to inform the mortgagee of the identity of his mortgage servicer. § 2605(b)–(c). The focal point of these obligations is the "effective date of transfer," or "the date on which the mortgage payment . . . is first due to the transferee servicer of a mortgage loan pursuant to the assignment, sale, or transfer of the servicing of the mortgage loan." 12 U.S.C. § 2605(i)(1); 12 C.F.R. § 1024.2(b) (same). Before this date, RESPA contemplates that servicing obligations thus rest with the transferor servicer. But after this date, servicing obligations rest with the transferee servicer. And so, § 2605(b)(1) and (c)(1) require both the transferor and the transferee to send notices to the borrower to inform him of any

12

"assignment, sale, or transfer" of servicing responsibilities. *See also* Amicus Br., CFPB, at 13–14 (describing the "Hello-" and "Goodbye-" letter requirements).

Because Harrell's mortgage payments became due to Freedom on November 1, 2017, that was the "effective date of transfer" of his loan under RESPA. RESPA thus contemplates that before this date, NYCB (the transferor) was the servicer. And from this date and forward, Freedom (the transferee) would be the servicer. So we believe the statutory notice provisions confirm to our interpretation of subsections (g), (i)(2), and (i)(3), and they confirm that Freedom was plausibly "the servicer" on the date Harrell's payment was due.

For all these reasons, RESPA places the obligation to pay taxes with the entity responsible for servicing a loan when that tax payment is due.

## B. Freedom's contentions

Freedom argues this reading is wrong for two reasons. First, Freedom asks us to home in on the definition of "servicing." According to Freedom, because servicing includes "making the payments of principal and interest and such other payments *with respect to the amounts received from the borrower*," and NYCB received Harrell's escrow payment, "[t]hat makes NYCB the servicer." Appellee Br. 11 (quoting subsection (i)(3)). In other words, "NYCB's duty under RESPA accrued prior to the transfer" of servicing, and "nothing prevented NYCB from paying the second installment early." Appellee Br. 12.

But this argument confuses the statutory duties of "servicers" with the definition of "servicing." Subsection (g) obligates "the servicer" to make timely payments from an

escrow account. And, as discussed above, that obligation is connected to the terms of the loan and the date a payment is due—not when a payment is received from a borrower nor when a bill is received from the taxing authority. *Accord Marks v. Quicken Loans, Inc.*, 561 F. Supp. 2d 1259, 1264 (S.D. Ala. 2008).

On the other hand, subsection (i)(3) simply defines servicing: "receiving any scheduled periodic payments from a borrower . . . and making the payments of principal and interest . . . ." The entity *responsible* for these activities, *see* subsection (i)(2), here Freedom, is thus obliged to make payments from escrow as they become due. It does not matter that another entity was once responsible for receiving payments for escrow. In sum, subsection (i)(3) identifies *what* servicing is. And subsection (i)(2) describes *who* a servicer is. But subsection (g) governs what a servicer *must do*.

An intuitive assumption seems to underlie Freedom's argument—that is, a middleman that receives a payment should be responsible for forwarding that payment along to the ultimate recipient. *See* Appellee Br. 15 ("[W]hen a transferor servicer receives from a borrower all the monies needed to cover tax obligations, that servicer is responsible for paying those obligations, regardless of an intervening transfer. Such a holding . . . is sensible."). Whether or not this assumption holds in normal transactions, it ignores the use of escrow accounts here. Borrowers, like Harrell, do not make payments simply to a servicer—rather, they make payments to a servicer for deposit into an escrow account. The servicer controls this account in trust; it is not the servicer's account. *See* 12 C.F.R. § 1024.17(b). And transferring servicing involves the transfer of control over this escrow account. *See* 12 C.F.R. §§ 1024.17(e), (i)(4)(ii). Indeed, transferring "all right, title and

14

interest" of NYCB to Freedom expressly included "Related Escrow Accounts." J.A. 94; *see also* J.A. 133 ("[NYCB] shall transfer to [Freedom] within three (3) Business Days after the Servicing Transfer Date by wire transfer pursuant to [Freedom's] instruction all Related Escrow Account balances."). And so we see no interpretive problem with a transferor servicer depositing a borrower's payment into escrow, and the transferee servicer dispersing those funds.

Second, Freedom argues that the "terms of the [Purchase Agreement] reaffirm the statutory designation of NYCB as the 'servicer' for the purposes of the November 2017 tax payment." Appellee Br. 12. Section 5.09(o)(i) of the Purchase Agreement provides:

> [NYCB] shall pay or cause to be paid, from the applicable Related Escrow Account, all real estate taxes on the Mortgaged Properties (and all interest, late payments and penalties in connection therewith) (x) for which either (i) a tax bill has been received, [or] (ii) a tax bill was issued on or prior to the Servicing Transfer Date . . . , and (y) that have due dates . . . prior to or within (30) days after the Servicing Transfer Date.

J.A. 136. "Thus," Freedom reasons, NYCB "was obligated to ensure payment of taxes billed with due dates before or within thirty days of October 31, the effective date of the transfer." Appellee Br. 13. And so, "NYCB was responsible for the November 15 payment." *Id.* But because control of Harrell's escrow accounts would be transferred on or shortly after the servicing transfer date, Freedom acknowledges that this clause required NYCB to act while it was still the servicer. *See* Appellee Br. 12 ("[N]othing prevented NYCB from paying the second installment early.").

Again, this argument misses the point. NYCB and Freedom are of course free to allocate responsibilities by contract. But a transferor's contractual responsibility to apply

a tax payment before the transfer of servicing has no effect on the transferee's statutory obligation. *Cf.* Amicus Br., CFPB, at 21 (discussing contractual relationships between "master servicer[s]" and "subservicer[s]"). Nor is RESPA concerned with what a previous servicer already should have done. This is a contractual matter for NYCB and Freedom to settle, and one on which we express no opinion today.

RESPA requires us only to identify who is responsible for servicing the mortgage on the date a tax payment is due. Based on Harrell's allegations, Freedom was responsible for servicing his mortgage and so was ultimately obligated to see that his tax payment was made.

*  *  *

The text of RESPA explains who must make a tax payment from escrow: The person "responsible for servicing the mortgage" when that payment "becomes due." 12 U.S.C. § 2605(i)(2), (i)(3), (g). Because Harrell has adequately alleged that Freedom was responsible for servicing his mortgage when his tax payment was due, this case may proceed. The judgment below is therefore

REVERSED.